162607 Presidio Components, Inc. v. American Technical Ceramics May it please the Court. My name is Ron Cahill and I represent American Technical Ceramics Corporation, the defendant and appellant in this case. Claim one is indefinite because the intrinsic evidence discloses no means to define a fringe effect capacitance that's capable of being determined by measurement. Why does that have to come from intrinsic evidence if something that, to take an extreme example, everybody in the business knows, why in the world would you have to say it in the intrinsic evidence? Will all of Nautilus, Dow, and Teva say that the guidance has to come from the intrinsic evidence? I don't think that they do. The Supreme Court reads section 112 paragraph 2 to require that a patent's claims viewed in light of the specification and prosecution history inform those skilled in the art about the scope of the invention. In light of what may already be in the heads of the skilled reader. Now if you're talking about a presumed meaning, if a claim term has a meaning that everyone in the art understands, that if you go to a textbook and it's there and there's no dispute about it, then that might be true. Simply using the name in the patent might be enough. That's certainly not the case here. Well there was an expert, and I gather just on one side, that said, you see what the patent says, you've got to be able to measure it. Here's how my graduate students or my second year engineering students would do it and there's no evidence to the contrary. Well that very expert provided a mountain of evidence to the contrary. He testified quite clearly that as of 2002, the datum. That this wasn't written down somewhere, that's all he said, right? He said it had never been done before, that it hadn't been disclosed in the patent or in any publication of any kind. But if nobody had any reason to do it before and the second year graduate student or whoever it was that he referred to would, upon being presented with the task, know how to do it and there's no contrary evidence, what's the uncertainty? Well the uncertainty is there's no guidance in the patent and that testimony is completely unsupported. So a person of ordinary skill in the art looks at this and as I understand the expert's testimony and the findings made by the court, it's almost like they testified that you're making a meal and you have a recipe and each technique is known. But the recipe isn't there. I think what the expert said was that loss performance testing was something that was disclosed in the patent and that's the methodology that he used. And what he also said was that testing the fringe effect or determining the fringe effect was not something that had been done before and that he needed to develop an approach to that, correct? So the basic loss performance testing was known. I know there's a dispute about whether the industry standard had been established at that time, but he said there was an established standard. That's hard to quarrel with, it seems to me. But what he said was nobody had done this before to determine the fringe effect, correct? That's correct. And he said that it would take his graduate students, whom he actually said were above the level of a person skilled in the art, six months to a year to do it. So is that sufficient? That somebody skilled in the art could make a determination in six months to a year? It doesn't seem to me it's quite the same thing as saying, oh, well, there's an established method, everybody knows about it, and I'm just going to use that established method here. He's not really saying that. He's saying the established method for loss performance testing, but that hadn't been done to separate out the fringe effect before. That's right. He did say those things, and insertion loss testing is shown in the patent for capacitors that don't have fringe effect capacitors. And the expert agreed that the patent does not teach how to use insertion loss testing to resolve fringe effect capacitance capable of being determined by measurement. And he further said, quite loudly, that there was no evidence at all in 2002 that insertion loss testing could be used in this way. And is it enough? I don't think it is. The purpose of the indefiniteness requirement. Let me just try to separate two things. One is your argument that the methodology has to be in the intrinsic evidence, and it seems to me that that's just not, in fact, supported by the cases, and indeed, if you look at the most important case, it expressly says that there's no categorical such requirement, and it doesn't make sense that there be a categorical requirement, that the patent teach people what they either already know or can reasonably figure out. And then the question is, well, okay, he had to figure something out. We're now no longer talking about a categorical bar to this kind of evidence, and I'm not sure why, in this case, where you had no contrary evidence to show that there were different methodologies so that, as a factual matter, it would be like Dow or like Teva or, you know, the Honeywell-Hyacinth case, where there were different methodologies and nobody would have any idea which one to use, and they might come out differently. There are no methodologies at all. There are none. And all of the experts agreed that there are none. All of the experts and a third-party witness agreed that insertion loss testing doesn't resolve fringe effect capacitance capable of being determined by measurement. Worse than Dow, in Dow, there were three methods that one could go to the yard and find. Here there are no methods you could go to the yard and find, right? There's a statement in Dow that here there's nothing in the patent that tells you which of the three methods to pick, or even if that's the universe of methods. Here the universe is wide open. We have an expert who says, I'll apply the scientific method and I'll figure it out. And my grad students who are above the level of ordinary skill in the art, you know what, it'd take them six months to a year to figure it out. How is that reasonable guidance? I think it's not, and it fails the public notice function. Companies like ATC... Well, that seems to me to be the issue, is to, there's no, nothing in the art that existed at the time that told you how to do testing to determine the fringe effect. And he said he had to develop a method and that it would take someone skilled in the art six months to a year to do that. But the question is whether that provides sufficient guidance to satisfy the Nautilus standard, right? Right. Now, in cases where you provide less guidance in the intrinsic evidence, those are cases where it's clear outside of the patent what it means. Here there's no clarity. There is no way to resolve it. No one's ever done it. The inventors never did it, which is probably why it's not in the patent. And there's no literature at all to say that it's even possible. And the expert's clear in the yellow brief at page 20 and the appendix at page 990. There's nothing in the patent that says a network analyzer can be used to determine whether the external contacts of a multilayer capacitor have a determinable fringe effect of capacitance between them, correct? And the expert says, correct. There's nothing in the patent that tells you you can do this. Can I change topics before your questions end? Sure. I mean, there are a lot of issues in this case, so any change of topic would feel like a radical change of topic. Here's my specific question, and I'm going to build in some assumptions. Let's assume, for purposes of this question, this is about the injunction. Assume, for purposes of this question, that there was not sufficient proof of lost profits. A, does the injunction have to go back for reconsideration? Because the district court relied in part on the presence of lost profits. And B, when it goes back, may the district court take up-to-date evidence, and in particular, what I'm thinking of, as I understand it, this injunction has been in place since November 15th of last year. I think that was judgment day plus 90 days for the so-called sunset provision. Actually, I think it was February, because it was stayed by this court for several months. So if it goes back, there's going to be a period of real-world experience about what your 550 customers have been buying since they couldn't buy the 550. Can the district court update the evidence to look at that? So, in theory, the court could look at that evidence. If it's considering anew the issue of whether an injunction should issue, I think it could consider that evidence. I'm not sure how much weight it would have, but I don't think there would be a preclusion to them considering it. Now, I agree that if lost profits is reversed, the court should simply remand for further consideration of the injunction. And perhaps at this point, unless the court has more questions, I'd like to reserve my time for a while. Where in your brief can I find a discussion that suggests that Dr. Huber's test that he utilized in this case with the insertion loss measurements and the fringe effects capacitance would have taken six months to a year to develop? Where is that in your brief? Show me in your blue brief where I can find that. Where in the brief? Certainly, I can find it in the record. Well, let's start with whether you argued it. I believe we did argue it. Where? I don't have the page cite in my head. When you come up on rebuttal, I'll expect you to have it at that point. I will look for it. Where is it in the record, just so I know? Since you said certainly, I can tell you where it is in the record. It's in the passage. We asked the court to read the section beginning at page 1008, and I believe it's right after that. My recollection is it's page 1012. It's right around there. Okay. I believe it's at page 1012. Okay. Mr. Schatz? May it please the Court, Brett Schatz on behalf of Presidio Components. Good morning, Your Honors. Good morning. Could we start with the lost profits issue because I'm a bit confused. You seem to be saying that the 560, which is the non-imprinting alternative, couldn't compete with the 550, but that comparison seems to me to be irrelevant. The correct comparison is whether the 560 is an alternative to your client's BB product, isn't it? That's correct, Your Honor. Well, what evidence is there in the record that the 560 wouldn't be competitive with the BB product? It's in the form of both documentary evidence and in the form of multiple. Okay, but I want you to show me where there's some testimony that the 560 couldn't compete with the BB. In other words, that if you took the 550 out of the market, that the BB would be sold instead of the 560. Sure. So first of all, it's in ATC's own documentation. Okay, but where? I want pages. I want to see where it says that. I'll recite the appendix. First off, 709. 709. And 712 through 714. Wait, wait, wait, wait. Okay. Where does this say in 709? So let me explain. These are internal ATC documents where they fail to identify the 560 as a competitive part in this market. Where? That's the first example. Where does it say that? It lists the parts that are competitive in the market and it does not list the 560. But they're talking about a market that includes the 550. The 550 is being taken out of the market. That's the assumption. I see. So you're referring then to Vince Thomas' expert testimony. I want to see testimony where it says that if you take the 550 out of the market, the people will turn to the BB instead of the 560. Sure. So Vince Thomas, Presidio's expert witness, at 1048 and 1049. 1048. And 1049, talked about the framework of his analysis, which is, quote, the 550 product was not in the market, close quote. And I'll have to give you a couple other pages because Vince Thomas testified to that repeatedly. Vince Thomas is the damages expert? That's right. Now he is assessing other testimony regarding the inferior performance of the 560 parts. Yeah, but he's comparing it to the 550. That's not relevant. Where does he say that the 560 isn't competitive with the BB? Well, first of all, Vince Thomas testified that his testimony was a framework where the 550 product was not on the market. He testified to that repeatedly. So the 550 is off the market, and Vince Thomas is giving his expert opinions about lost profit damages. Okay. So where does he say the 560 isn't competitive with the BB? Well, that testimony comes directly from ATC's own witnesses. Where? Okay. I'm going to give you several citations. Just start with one. Give me your best citation. Okay. The appendix 735 to 736. Mr. Rabe from ATC. Hold on a second. 735. Okay. Mr. Rabe identifies the 560 as a reduced performance part. Where does he compare it to the BB? That would be found at the following citations. Just give me your best one. Don't leave me a list. That doesn't help me. Give me your best citation as to where the witness compared the 560 to the BB. 697 to 700. 697. Okay. So where does he address this? I believe in that excerpt, Mr. Rabe did not. He agreed that ATC as a company did not identify the 560 as a You mean because someone didn't identify it in the market as competitive to the BB that that means that that's evidence that it's not? Yeah. He testified it's a reduced performing part and it's not competitive to the Presidio BB part. Where does he say that? In the citations I would like to give you. 697 to 700. Okay. So where does he say it? And then 712 to 714? No, we're on 697 to 700 and we want you to actually identify the precise language. Well, the testimony was he was asked to identify the parts that are in this relevant market. And he did not identify the 560 as even being in the relevant market. But that's not. Actually, that's not even what the testimony says. Do you know what Presidio products are competitive with ATC's UBC products? That's not tell me every product in the relevant market. He's asked about the specific Presidio products. And he says, you're going to test my memory. It's late in the day. It's the BB series. I think, but I could be wrong off the top of my head. I just can't remember, frankly. But the question wasn't tell us everything, including ATC's other products that might be competitive. The questioning is very precise. It's tell us what Presidio products. Did you not bring your appendix? I did. We have it here. But there are several citations where Mr. Rabe testified essentially that the 560 is not in the market because it's a reduced performing part. Well, it's not in the market at the time that the 550 was being sold. Where does he say that if you take the 550 out of the market, that the sales will go to the BB rather than the 560 because the BB is superior? Well, with all due respect, that's a hypothetical that a witness, a factual witness would not answer. But what you have here is a- So you don't have any evidence? Well, I believe it's 709 and 712 through 714. Again, he's testifying which products are in the relevant market. And he didn't refuse to identify the 560 because he had identified that as a reduced performing part. As compared to the BB? In one instance, he testified that as compared to the Presidio BB. Where? I believe it's, well, I'm assuming 712 to 714. Well, you're assuming, I don't want you to assume. I want you to show me where he gave such testimony. Okay. Your Honor, I apologize. I can't put my finger on that precise language. But the sum of, let's step back and look at the standard of review. The standard of review, there has to be evidence. If you can't show us the evidence, you have a problem. I agree. And when Evan Slavitt from ATC testifies that the 560 is not as good as the 550 part, that's indicative that this is a reduced performing part. And that is consistent with Mr. Rabe's testimony where he testified that it is a reduced performing part. Well, it's reduced as compared to the 560. But what we don't know is how does it compare to the BB series product that would be the alternative to the 560. And that's your problem. Your problem is you've got a market here where there is an alternative and where ATC has made a very reasonable argument that why would they compete with themselves? Their 560 product is better performing, probably because they stole your fringe effect capacitance, but it's better performing. And it costs, they have a higher profit margin. So why would they offer an alternative of their own to their own product? Why not just stick with the 560? However, if they can't make the 560, they've got this other thing fully developed, sold at least to one customer, and available to step in in place of their 560. And the problem is this record is devoid of anything that suggests the customer wouldn't buy the 550 and would turn to the BB product instead. Okay. Well, I would respectfully disagree. I do think there's evidence in the record. And you need to point us to it. And I will try to find the precise citation. But I do believe Mr. Rabe testified that ATC as a company did not identify the 560 as a performing part in this market. Let's turn to the indefiniteness question. Yes. Melissa, did you have a question? So we've got this insertion loss testing, which your expert testified could be used here. But he said that it would take his graduate students who have a skill above that of the person skilled in the art six months to a year to do it. Is that sufficient to make it not indefinite? Well, I would say... He didn't really testify to that, did he? Don't you want to look at the testimony and what Judge Stark has suggested he actually said? Absolutely. That's where I'd like to start because that is not at all what Dr. Heidner said. That was taken out of context. What Dr. Heidner said was... What's taken out of context? He says that it would take them six months to a year, doesn't he? Actually, he did not say that. And frankly, it was somewhat of a joking response in a long-winded answer. We're not going to have to disregard it because it's supposedly a joke. This is on page 1012. He says, do I want to wait six months or a year for them to go through and figure it out? No. And that's not direct testimony that it would take his students or a person of skill in the art six months to a year to figure out. In fact... What is he saying? Just out of curiosity, does he only teach grad students? No, he does not. He takes all types of students. Does he say grad students in this passage? I don't actually see that anywhere. No, he does not. He just says if I turned a bunch of random students loose on this, it might take them six months to figure out. But he doesn't say his grad students. He doesn't say these students would be a skilled artisan because what was the definition of a skilled artisan? It was a person with a degree already, right? That's exactly right. A random undergraduate student might take six months, but they're not a person of skill in the art. And doesn't he testify on the prior page that a person of skill in the art, on the other hand, would know exactly how to do this? In fact, ATC's own expert admitted that a person of ordinary skill in the art understands the insertion loss measurements that are disclosed in the specification. Well, surely that's true, but where is the testimony that someone skilled in the art could develop this testing method in under six months? Is there such testimony? There is. Dr. Huebner testified to it repeatedly, first of all. Show me where he testified that it could be done in less than six months. 984 to 985. Dr. Huebner testified at length that a person of ordinary skill in the art- Where? Not at length. Where? Where does he say that somebody could do it in under six months? He testified that a person of ordinary skill in the art already knows how to do it. No one needs to figure it out because- No, he never said that somebody knows how to do it. He said someone could figure it out. Well- I figured it out. Actually, I disagree with that, Your Honor. The testimony from Dr. Huebner is that a person of skill in the art already knows how to undertake insertion loss measurements. Well, that's true, but he doesn't say that someone skilled in the art would know how to apply insertion loss measurement to determine the fringe effect. That's the point. There's no, you know, there certainly is testimony that people knew how to do insertion loss testing. That's not the question. The question is, did someone know how to determine the fringe effect capacitance by doing a form of infringement- infringement loss testing? Dr. Huebner- Insertion loss testing. And he said, I had to develop a method to do it. Correct? Dr. Huebner testified to that directly at 1507. He said I had to develop a method, right? Well, what he said- Yes or no? He said he knew how to undertake insertion loss measurements and a person of skill in the art knows how to isolate discrete capacitances like the fringe effect- And he testified that he had to figure out how to do it. There was no established- there was no established method for determining how to determine the fringe effect capacitance, right? On page 1011, didn't he testify, I cannot nor would a faceta need to be told what to do. That's what a faceta is. They can figure it out on their own. They don't need a publication to figure out. This is just what engineers do. And that's exactly what ATC's own expert agreed to as well. But that's the point. He had to figure it out. He wasn't going to an established method for determining the fringe effect capacitance, right? I think, with all due respect, what he was testifying to is that a person of ordinary skill in the art knows insertion loss measurements, knows how to undertake them, and there's no dispute about that. And the district court made factual findings to that account. And that is directly supported by credible expert testimony. And let's step back and look at where we are here. The standard of review of those factual findings is clear error. And when you have sole competing evidence from an expert on ATC's side who the district court found is not credible, Presidio's position is that is impossible to show clear error in that situation because there's no counteracting evidence. I understand, but I'm just trying to figure out what your witness testified to. He did testify that insertion loss testing was well known. He testified that even though there wasn't an industry standard for it, it was well known how to do it. But then he said to apply that to determine the fringe effect required me to develop a new methodology, right? No. No? At 1507 through 1509 and 1010 through 1012, one of the examples Judge Moore just gave was 1011. Dr. Huebner testified at length that a person of skill in the art already knows that insertion loss measurements are used to measure the impact of- You're not responding to my question. He testified that people knew how to do insertion loss testing, but he did say I had to figure out how to use that methodology to figure out the fringe effect and that that required me to develop a new methodology. Respectfully, Your Honor, Dr. Huebner testified that a person of skill in the art knows how to isolate these discrete capacitances such as fringe effect capacitance and use insertion loss measurements to determine their impact. So a person of ordinary skill in the art already knows how to evaluate- Am I remembering correctly that the methodology is basically you have a bunch of capacitors in this multilayer thing, you kind of knock each one out and once you've knocked each thing out by subtraction, that capacitance that remains is what's on the fringe effect? Well, I think- It's a variation of that. Yes. A person of ordinary skill in the art knows how to isolate discrete capacitances and there's no dispute about that. Keith Anderson, third party witness, testified to that effect. Dr. Ulrich, ATC's own expert, testified that if you make a capacitor, a person of skill in the art can understand that that change causes a change in the insertion loss measurements. So there's no dispute here. I apologize, I am completely over my time. I'd like to reserve a few minutes for my cross-appeal if possible, but I understand I'm out of time. We can still answer the question. Your Honor, I believe I have. Your question is whether Dr. Huebner testified whether a person of skill in the art already knows without having to figure out how to isolate a discrete capacitance. And the testimony is absolutely clear that a person- And then he said that he had to develop a test. And he said, I could do that because, quickly or whatever, because I'm above the level of ordinary skill in the art. And then he talks about that it would take six months for someone of skill in the art to do it. Let's assume that that's his testimony. I know you don't agree with that. But let's assume that he testified that it would take someone skilled in the art six months to a year to develop the methodology. Is that sufficient under Nautilus? Assuming that to be the case, and I completely disagree with that assessment, but assuming that's the case, it is because it provides reasonable certainty to a person of ordinary skill in the art about the scope of the invention. It is the impact- Well, suppose it took a couple of years to develop a methodology. Would that make it not indefinite? If it provides reasonable certainty to a person of skill in the art, there is no timeline where it has to provide this information. And, again, I disagree with the assessment when I make that comment. Okay. Well, we'll give you two minutes for your cross-appeal. Thank you very much. Thank you very much. I do appreciate that. I know I'm out of time. The district court's decision regarding intervening rights should be reversed. And here's why. The addition of the phrase by measurement to the claims is not a change in claims scope. That change did nothing more than exclude theoretical fringe-effect capacitance from the scope of the claims. But isn't it- certainly the by measurement language is different from the language that was in the ultimate claim construction that Judge Gonzalez had. Why was that not a substantive difference in the sense that by your own evidence in the first case, there was a basis for finding coverage that would not qualify under the new claim, even if it's a very small difference? Sure. So that's because there were no special interrogatories presented during the first trial. To speculate about why the jury found infringement in the first trial is just that. It's speculation. Well, but in the first trial, the evidence that you put on was the theoretical measurement. And the other side argued that that wasn't sufficient evidence. And Judge Gonzalez said, yes, that's sufficient evidence to show infringement. Correct? And again, I disagree with that because also presented at trial were the insertion loss measurements of the accused part, the 545 capacitor. No, but is it not the case that you presented evidence at the first trial of theoretical measurement as showing infringement? Is that not the case? That was part of the evidence that was presented as background to why the 545- Okay. And is it not true that Judge Gonzalez said that that evidence was sufficient to show infringement, that theoretical measurement? The district court found that there was sufficient evidence presented at trial. Well, specifically discussing the theoretical measurement. I respectfully disagree. The district court cited that the evidence presented at trial was that the 545L was an infringement. There was evidence that the 545L had very low insertion loss. And Dr. Huebner testified to that. Now, the district court did say there's sufficient evidence on the record and did cite to Dr. Huebner's testimony that the fringe effect capacitance is present. But Dr. Huebner never testified that it's theoretically present. Dr. Huebner testified that it has an impact on the performance of that part. But he testified as to the results of the theoretical measurement, right? The formula. That was one of the things he testified to. And Judge Gonzalez said that that evidence shows infringement. I think Judge Gonzalez said that that is sufficient evidence. I don't think when she makes that decision, she is stating the scope of the claims. Rather, when Judge Gonzalez says, acknowledges ATC's argument that fringe effect capacitance always exists in theory and, therefore, can always be calculated, and then rejects that argument because that theoretical fringe effect capacitance does not make it determinable as required by the claims, that's indicative that theoretical fringe effect capacitance was always excluded. I would also consider or have the panel consider that when reviewing the unamended claims, of course, we need to evaluate this in terms of the specification. The specification recites, and all the parties agree, that the prior art includes theoretical fringe effect capacitance. The first time that the specification talks about the claim fringe effect capacitance is in the context of figure 10 where it says this, quote, illustrates an alternative device that embellishes the capacitor network described in the theory of operation of the device of figure 9. I'm not sure that it is even theoretically enough to say that the mere use of a theoretical equation distinguishes the two situations. The question is, what kind of measurement technique might or might not have been covered by the preamended claim that isn't covered by the amended claim? And lots of measurement techniques use equations in getting to an ultimate measurement, so the use of an equation all by itself, I don't see why that makes, in fact, a substantive difference. But wasn't there, in fact, different evidence that Dr. Huebner put on and that Judge Gonzales found sufficient in the first case, the preamended claim, that would not now qualify? Well, a part of Dr. Huebner's evidence during the first trial was the calculation, yes. But he also presented evidence, and ETC's own document showed the insertion loss measurements of the 545L, exact measurements that Dr. Huebner is undertaking in this present case. But he hadn't developed the methodology to be presented in the second case at the time of the first case. Insertion loss measurements were always known. No, no, no. I understand that. But as a technique for determining the fringe effect, he hadn't developed that at the time of the first trial. I would suggest that the insertion loss measurements on the 545L were already part of the case, so there was no need to do so. And I apologize, I am way over time. There was no need to do so, so he hadn't done it yet. There was no need to do so because he had... No, just the question is, had he done it? He hadn't done it yet, right? He did not undertake his own insertion loss measurements on the 545L because it was already part of the record from ETC's own documents. But what to do with these insertion loss measurements? He has a bunch of insertion loss measurements, and he decides to use this one at this stage and this one at this stage, and it's a 17-step process. Call that the entire methodology. That sequence of steps to get to the measurement in this case was not a sequence that he had developed and put together and used in the first case. I agree. Yes. Okay. Thank you. Thank you very much for your extended time. Mr. Cahill? Thank you, and thank you for your patience, Judge Moore. We refer to the six months or a year at least at page 30 of the yellow brief, and it does say there... At the yellow brief, the reply brief? Yes. So in your argument to this court, you don't make the argument that Judge Dyke makes?  No, I don't make arguments. I don't make arguments. I ask questions. I think that's a matter of interpretation. Go ahead. We cited to it many, many times, but I don't think we actually said six months or a year until the yellow brief. Nowhere in your blue brief, yes. Excuse me? It's nowhere in your blue brief, correct? I haven't been able to find it in the blue brief. Since my mind at least is on this intervening rights issues, since we just talked about it, can you explain what you think was held to be and properly covered in the pre-amended claim that's now outside the amended claim? That would be calculation of a capacitance between the two end-to-end conductors. So in... I thought it... That's now... That's what Dr. Huebner did here. He calculated a capacitance in the end-to-end capacitance, didn't he? No, he did not. Did he calculate it? No, he didn't. Did he show that a calculation is possible? He said it was possible. He never did one. Okay, so... But the claim doesn't require a number, right? It just shows... That is, it doesn't say measured at, I don't know, 0.1 farads or something. It has to be determinable by measurement. Right. So there was no reason to calculate it. So what is it that was covered by the pre-amended claim that is now not covered? Well, it is the proof from Presidio I, where you look at the capacitor, you pull all of its various dimensions, you plug those dimensions in the dielectric constant into a formula, and you calculate a capacitance. That's the sufficient proof, the substantial evidence that supported the jury verdict in Presidio I. That exact same argument was made to the Patent Office in re-examination with a piece of prior art that had all the right dimensions in it. And the Patent Office agreed, and Judge Huff agreed that that anticipated the claim. Right, but... And now they... Look, here's my problem. If the following happened here, it seems to me you lose on intervening rights. If the following, and the following is the PTO says, we do BRI, Broadest Reasonable Interpretation, we don't do normal Phillips claim construction. So in this forum, it's not enough to do what you did in the district court. We're going to make you put it in the claim. In some sense, that's the whole purpose of BRI. If at the end of the day, the language put into the amended claim is absolutely nothing but the claim construction adopted in the district court by Phillips case, then their scope is the same. What came out of the Patent Office and what went into the Patent Office, even though the PTO along the way said, you don't survive on Phillips here. How is what came out of the PTO narrower than what went into the PTO? What's within the pre that is not in the post? Well, it's that calculation by measurement. And the examiner expressly considered the district court's construction. It is in the record at 2777. And the examiner said something that might well be, well, we do BRI here, we don't do Phillips. He actually adopted, he actually looked at the claim construction from the district court that requires the fringe effect capacitance to be determinable. And he said, well, even if it's determinable, you can derive it using the calculation. Exactly what Judge Gonzalez found in the post-trial motion. I'm a little confused. Help me here. As I understand it, the first trial, the evidence was that there was this theoretical formula and a calculation by the expert based on this theoretical formula showing that there was measurable fringe effect capacitance. But my understanding now is that the patentee is not contending that that is within the scope of the claim, obviously, because that would create anticipation or obviousness problems, that there is agreement, is there not, at this stage, that that theoretical measurement that was satisfactory in the first case wouldn't be within the scope of the claim now? We certainly agree with that. Well, don't they agree with it, too? I mean... After... I think I just heard... I don't know. I don't know. I don't know what they would agree to. Can I just... Wait, just a second. So there were issues here of possible anticipation or obviousness, which, if I understand correctly, and I may be wrong about this, but correct me, that were dealt with by saying, no, that kind of theoretical measurement, which preexisted the patent here, is not sufficient under the patent, that you have to have an actual measurement using the kind of measurement that was developed by their expert, right? After amendment, that's exactly the case. Let me ask a slightly different question, which is, during reexamination, not only this capable of being determined by measurement language was added, but also proximity was added. Prior to the amendment in reexam, the claim used to say the first and the second contacts have to be located sufficiently close. After amendment, it expressly says they have to be in an edge-to-edge relationship. I can't figure out why, for the life of me, that argument wasn't made, because wouldn't that create immediately, unquestionably, a change in proximity, and therefore solve your entire intervening rights problem, and we wouldn't be having this complicated discussion about what happened in the first district court, what happened in the PTO, whether the constructions were the same. Why did you not make this argument? What am I missing? Why doesn't this actually cause you to win on this issue easily, and yet you didn't make it, so what am I missing? When Presidio amended the claim, they amended the claim to adopt the claim construction from Judge Gonzales, which was also adopted by Judge Huff, and it included that language. So they amended in the district court claim construction. So the first district court required them to be in an edge-to-edge relationship, even though the claim itself only says they have to be located sufficiently close? That is correct. So the words that were different, the words that were not part of the claim construction before, were by measurement, and that's why we focused on that. Okay, anything else? Uh, Mr. Schatz, we'll give you one minute on the question. Thank you very much. Could I be clear that you do not now contend that the claim scope here would cover the kind of theoretical evidence and theoretical measurements that were presented as evidence in the first trial, right? Correct, and specifically, it never included that claim language. That's right. And that's really spelled out by the specification itself, where there is a signal to a person of skill in the art where the prior art is disclosed as having theoretical fringe effect capacities. There is no dispute between the parties that the prior art disclosed in the patent discloses theoretical fringe effect capacities. And then there's a transition in connection with Figure 10A where it distinguishes that theoretical fringe effect capacitance, that theory of operation, to an impact on insertion loss measurements. So to a person of skill in the art, there's a direct signal that what is in the prior art is theoretical fringe effect capacitance and the claimed invention is not that. And keep in mind that ATC in this case repeatedly relied upon the fact that theoretical fringe effect capacitance is not in the unamended claims. This is ATC arguments. Quote, Judge Gonzales squarely held that even if fringe effect capacitance is always present between the contacts of the multilayer capacitor, it does not necessarily mean that the capacitor has fringe effect capacitance that is, quote, determinable as required by the court's claim construction. What were you just reading? That was ATC's argument against summary judgment of infringement. Here? I'm sorry? Here or there? In this present case. Right, and that was essentially a quote from the post-trial ruling that's at Appendix 5334, the Judge Gonzales' post-trial ruling rejecting the... I mean, upholding the rejection of the anticipation defense. Yes, that is ATC characterizing Judge Gonzales' decision. It's practically a quote. It is, and it's at Appendix 5592, and they make a similar argument, I apologize, at 5593, quote, Indeed, if it did mean that, Judge Gonzales would clearly have held the 356 patent invalid as anticipated by the prior art. This is ATC characterizing and relying upon Judge Gonzales' decision in doing so in the present case as not including theoretical fringe effect capacitance. Okay, I think we're out of time. Thank you very much. I thank both counsel. The case is submitted.